Heinz Binder (SBN 87908)
Robert G. Harris (SBN 124678)
Wendy W. Smith (SBN 133887)
Roya Shakoori (SBN 236383)
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
Tel: (408) 295-1700
Fax: (408) 295-1531

Email: Heinz@bindermalter.com
Email: Rob@bindermalter.com
Email: Wendy@bindermalter.com
Email: Roya@bindermalter.com

Proposed Attorneys for Debtor and Debtor-in-Possession
MI PUEBLO SAN JOSE, INC.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No. 13-53893-ASW |
| MI PUEBLO SAN JOSE, INC., | Chapter 11 |
| Debtor. | Date:<br>Time:<br>Place: Courtroom<br>280 South First Street<br>San Jose, California |

**MOTION FOR ORDER AUTHORIZING DEBTOR TO
(I) CONTINUE PRE-PETITION CASH MANAGEMENT PRACTICES AND
(II) MAINTAIN ITS CREDIT CARD MERCHANT PAYMENT SYSTEM**

1. Mi Pueblo, Inc., a California Corporation, Mi Pueblo and debtor in possession in the above-captioned bankruptcy case ("Mi Pueblo"), hereby submits this

motion (the "Cash Management Motion") for an order (i) authorizing Mi Pueblo to continue its pre-petition cash management system, including the use of its existing bank accounts, (ii) authorizing Mi Pueblo to maintain its credit card merchant payment system, including compelling certain credit card companies to continue merchant services, and (iii) continuing to use its current business forms.

2. This Cash Management Motion is based on the Memorandum of Points and Authorities set forth herein, and is supported by the accompanying declaration of Juvenal Chávez. By separate application, Mi Pueblo requested a hearing on this matter on shortened notice to parties in interest. In support of the Cash Management Motion, Mi Pueblo respectfully represents the following:

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. JURISDICTION AND VENUE

3. Mi Pueblo continues to operate its businesses and manage its assets as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. This Court has jurisdiction over these Chapter 11 cases (these "Cases") under 28 U.S.C. §§ 157 and 1334. This Motion constitutes a core proceedings under 28 U.S.C. §157(b)(2). Venue of this case is proper in this District under 28 U.S.C. §§ 1408 and 1409.

### II. FACTUAL BACKGROUND

**A. History:**

4. Mi Pueblo was started in 1991 when Juvenal Chávez opened his first 5,000 square foot store called "Country Time Meats." Over the following 22 years, Mr. Chávez has built the first store into a chain of supermarkets serving the Hispanic community. Mi Pueblo has twenty-one stores: fifteen in the Bay Area, three in the

Central Coast and three in the Central Valley. Mi Pueblo also maintains a warehouse and distribution center in Milpitas, offices in San Jose, and a workshop and storage facility. In the year 2012 Mi Pueblo had annual sales of over $350 million.

Mi Pueblo has a unique place in the communities in which it has stores, doing business in under-served locations that have been abandoned by large market grocery chains and in locations that otherwise do not have access to full service groceries providing wholesome foods and fresh fruits and vegetables. Mi Pueblo staffs its stores with bilingual employees and stocks merchandise geared to the Hispanic buyer, but also serves the broader community providing full service grocery merchandise to communities in which such items are not generally available

5. Mi Pueblo's stores offer a unique shopping experience to the underserved Hispanic community by providing a friendly, upscale environment with familiar brand names, including brands imported from Mexico, Central and South America. The stores also provide marinated cuts of meat, creamerias with specialty cheeses from throughout Central and South America, tortillerias that make fresh tortillas throughout the day, and delis that provide made-to-order Hispanic dishes.

6. Mi Pueblo's founder Juvenal Chávez has been recognized in the grocery business for his deep commitment to providing needed service to the Hispanic community, and has received the Hispanic Business Excellence Award, the award for Outstanding Community Enterprise from the National Grocer Association, and the award for Outstanding Independent Business from Progressive Grocer. Mi Pueblo has over 3,200 employees and is the fastest growing independent supermarket chain in Northern California.

**MOTION FOR ORDER AUTHORIZING CASH-MANAGEMENT AND CREDIT CARD MERCHANT PAYMENT SYSTEMS**
Page 3

7. Mi Pueblo has also demonstrated a commitment to serving the community through philanthropy. From raising over $100,000 to assist victims of the Haiti earthquake to starting their own scholarship program providing much needed assistance to students who are attempting to turn their dreams of a college education into reality. From 2012-2013, Mi Pueblo distributed over $550,000 in scholarships to students throughout the communities they serve.

8. Mi Pueblo is current on all obligations to employees, suppliers and all of its creditors, including its secured creditors. Mi Pueblo's current financial circumstances are the result of an impasse in negotiations with its largest secured creditor, Wells Fargo Bank. Although Mi Pueblo has not defaulted on any payments in any of its obligations, the demands from the bank to cure certain non-financial covenants could not be met.

**B. The Cash Management System**

9. In the ordinary course of business, Mi Pueblo maintains an integrated cash-management system that provides well-established processes for the collection, concentration, management, monitoring, and disbursement of funds generated and used in its operations (the "Cash Management System").

10. The Cash Management System enables Mi Pueblo to effectively manage and monitor the inflow of receipts and outflow of disbursements from its stores, and accommodates Mi Pueblo's reliance on third-party providers who process customer payments. It is critical that the Cash Management System remain intact to ensure seamless customer experiences and continued collection of revenues for Mi Pueblo's estate.

11. The Cash Management System consists of six bank accounts (collectively, the "Bank Accounts"). The accounts include a single master account (the "Main Account") at Wells Fargo Bank ("WFB") where cash is generally concentrated,

and is used to receive incoming payments, deposit checks and make certain electronic and other disbursements in the ordinary course of Mi Pueblo's business.

12. As part of their daily operations, Mi Pueblo's stores collect cash, money orders, checks, credit card, debit and electronic benefit transfer ("EBT") payments at the point of sale in the stores (the cash registers). Most personal checks, and 3rd party checks are electronically deposited into the Main Account, with cash from sales deposited into the same account via armored car. Credit card, debit card, and EBT transaction information is sent to the card processors (see discussion below) and the proceeds sent to an account at Union Bank of California ("Union Bank"). ACH Check Information and Coinstar information are processed through TeleCheck and Coinstar, respectively, and the proceeds deposited into the Main Account.

13. In the ordinary course of Mi Pueblo's business it partners with MoneyGram Payment Systems, Inc. ("MoneyGram") and with Cha Cha Enterprises, LLC ("Cha Cha") to provide customers with the ability to purchase money orders, wire funds, and make customer utility payments (collectively, "Money Orders") and to cash checks at a separate Customer Service counter at Mi Pueblo stores (the "Customer Service Counter"). Mi Pueblo and MoneyGram are parties to a Master Trust Agreement whereby MoneyGram appointed Mi Pueblo as its agent to provide the MoneyGram services at its stores. Customers purchase the Money Orders at the Customer Service Counter. Mi Pueblo transfers the money to MoneyGram, which pays the Money Order amount at the location directed by the customer. A small commission is earned on each sale. This is paid to Cha Cha, which assumes the risk of items that are returned from the bank (bad checks). Mi Pueblo receives the rest of the transaction proceeds in trust for MoneyGram ("MoneyGram Trust Funds"), which is then transferred through the Main Account and into a segregated account on a daily basis (the "MoneyGram Account"). The Customer Service Counter in each store also provides a significant check-cashing service as an accommodation to employees and customers. A small fee is paid to Cha

**MOTION FOR ORDER AUTHORIZING CASH-MANAGEMENT AND CREDIT CARD MERCHANT PAYMENT SYSTEMS** **Page 5**

Cha on third-party checks, as Cha Cha assumes the risk of checks being returned by the banks on which they are drawn. Checks are processed through the WFB main account, but the debits for the bad checks are debited by WFB directly to Cha Cha's account.[1]

14. Disbursements are made from the Main Account and from the four designated accounts at WFB, described below, that are funded from the Main Account. The major disbursements that are made directly from the Main Account are: bank fees, store currency orders, Fedwire payments to vendors, ACH debits to the account made by certain vendors and principal and interest payments to both WFB and to Cha Cha on outstanding loans. The following designated accounts at WFB are funded from the Main Account: (a) the payroll account which is to fund payroll to Mi Pueblo's employees being paid by check and to its payroll processor for employees being paid via direct deposit; (b) a healthcare account which is used to issue checks to healthcare providers; (c) a payables account which is used to issue checks to corporate vendors; and (d) the MoneyGram account described above. The funds received by Union Bank from credit and debit card and EBT processors are transferred to the Main Account.

15. As of the Petition Date, WFB and Union Bank are designated as authorized depositories by the Office of the United States Trustee for the Northern District of California pursuant to the U.S. Trustee Chapter 11 Guidelines for the Northern District of California.

16. Mi Pueblo maintains detailed and accurate records of all disbursements and transfers flowing within and outside of the Cash Management System, including all checks that are written on its accounts. The electronic, Web-based services offered by WFB and Union Bank allow Mi Pueblo to easily monitor its disbursement account balances and activity, and to generate reports, hold and release checks, and, with

---

[1] Mi Pueblo is also filing a motion to allow the payment of all MoneyGram Trust funds.

**MOTION FOR ORDER AUTHORIZING CASH-MANAGEMENT AND CREDIT CARD MERCHANT PAYMENT SYSTEMS**
Page 6

respect to the WFB accounts, stop payments, transfer funds and send wires and ACH payments.

17. Cash Management Systems are complicated and require skill and training in their use and administration.  Maintaining the Cash Management System in its current state is crucial to Mi Pueblo's operations in light of the significant volume of cash transactions managed through the Cash Management System every day. Mi Pueblo is familiar with the Cash Management System which enables Mi Pueblo to reconcile, control and monitor its accounts in a seamless, expedient fashion. Any disruption to the Cash Management System would unnecessarily disrupt Mi Pueblo's complex day-to-day operations and thereby cause unnecessary harm to the estate. Mi Pueblo therefore requests that it be allowed to continue the Cash Management System and related historical practices and that its banks be ordered to honor checks and disbursements from the Bank Accounts.

**C. Credit Card Merchant Payment System**

18. As with any retail grocery markets, many of Mi Pueblo's customers pay for their purchases with various credit cards, bank debit cards and EBT payments. Mi Pueblo, as a community-oriented grocery store, has accepted electronic forms of payment, since the inception of each such form, in an industry where its competitors accept credit cards and debit cards. Its customers shop at Mi Pueblo's stores with the expectation of being able to pay by credit card, debit card or EBT. Turning away unsuspecting customers who are unable to pay with cash would not only result in the direct loss of those sales, but could also upset customers leaving them angry and unsatisfied, damaging goodwill and requiring the restocking of goods that such customer is no longer capable of purchasing. Consequently, any interruption with Mi Pueblo's ability to accept and process credit cards, debit cards and EBT payments, even for a minimal time, would result in lost sales and diminished customer goodwill.

19. Mi Pueblo has various agreements pursuant to which it maintains a system (the "Credit Card Merchant Payment System") which facilitates payments by customers with credit cards, bank debit cards or EBT payments. Mi Pueblo is a party to the "First Data Merchant Services Agreement" (the "First Data Agreement") with First Data Corporation ("First Data") for its MasterCard, Visa, Discover, and debit card transactions and its EBT payments, with customers. Pursuant to the First Data Agreement, credit card, debit card and EBT sales are submitted to First Data, who then processes the sales and submits the appropriate funds to a designated account, less certain fees as set forth in the First Data Agreement. First Data offsets any costs incurred from charge-backs from new receipts.

20. Mi Pueblo is also a party to a similar agreement with American Express ("AMEX," collectively with the First Data Agreement the "Payment Processors") for the processing of customer purchases with AMEX credit cards . Sales purchased with AMEX cards are processed by AMEX, who then submits the appropriate funds to Mi Pueblo's designated account. AMEX offsets any costs incurred from chargebacks from new receipts.

21. Approximately 40% of Mi Pueblo's aggregate monthly sales transactions are made via credit card, debit card or EBT sales. The processing agreements are critical to Mi Pueblo's ongoing business. Mi Pueblo might be unable to find alternative merchant services similar to those provided by the Payment Processors, and any loss of services from the Payment Processors will cause a deleterious lapse in Mi Pueblo's ability to accept payment.

22. Mi Pueblo believes that the fees collected by the Payment Processors are *de minimus* in relation to the value the processing agreements bring to Mi Pueblo's overall ability to collect and process payments and transact purchases. As such, maintaining the relationship with the Payment Processors is essential for Mi Pueblo to facilitate sales to its customers. The Payment Processors do not have any significant risk of loss

by continuing their services, as their costs and processing fees are deducted from funds received for each transaction. To the extent that the Payment Processors have not settled all pre-petition card transactions and collected their respective fees related thereto prior to the Petition Date, Mi Pueblo requests authority to allow the Payment Processors to collect pre-petition fees related to pre-petition card transactions settled on behalf of Mi Pueblo.

**D. Use of Business Forms.**

23.    As part of Mi Pueblo's ordinary business, including the complex cash management and credit-card merchant programs described above, Mi Pueblo uses a range of business forms, including letterheads, purchase orders, invoices, and checks (collectively, the "Business Forms"), without reference to its debtor-in-possession status. Creditors and vendors doing business with Mi Pueblo will be aware, pursuant to the notice of the case commencement that will be disseminated in this case in addition to the press release issued by Mi Pueblo, that Mi Pueblo has filed bankruptcy.

24.    Mi Pueblo must protect and preserve the goodwill with its customers and vendors by maintaining the use of the current Business Forms. In addition, Mi Pueblo already possesses a stock supply of Business Forms which do not state that it is a debtor-in-possession. Revising Mi Pueblo's existing Business Forms would create an unnecessary and expensive burden to the estate.  Moreover, the time and expense for such revisions would be disruptive to Mi Pueblo's business operations and would not confer any benefit on those dealing with the company. Mi Pueblo, therefore, requests that it be authorized to continue to use its Business Forms without placing a "debtor-in-possession" label on them.

**III. MEMORANDUM OF POINTS AND AUTHORITIES**

**A. Cash Management System**

25. Bankruptcy Courts treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*,

79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). While few opinions focus on this issue, some do reference the granting of authority to continue cash management systems. In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the Eleventh Circuit Court of Appeals affirmed a district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing Mi Pueblos to utilize their pre-petition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id.* at 621. *See also In re Voyager Express, Inc.*, 2009 Bankr. LEXIS 4598 (Bankr. D. Colo. 2009) (authorizing debtor to continue to use its existing bank account, in connection with a debtor in possession financing motion).

26. Section 345(a) of the Bankruptcy Code authorizes deposits of money "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment" and further provides that "[e]xcept with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States" a bond or deposit of securities is required from the institution where funds are deposited. 11 U.S.C. § 345(b). Two of Mi Pueblo's Bank Accounts are at WFB and Union Bank, both of which are federally insured banking institutions and are depositories approved by the United States Trustee. [*See* Federal Deposit Insurance Corporation website and searchable database at: http://www2.fdic.gov/IDASP/main.asp; United States Trustee Region 17, List of Authorized Depositories, Northern District of California, First Quarter 2013].

27. The Region 17 United States Trustee Guidelines (the "UST Guidelines") generally require that a debtor open a general account, a payroll account and a tax account, and other such accounts necessary for its operations. UST Guidelines, Sec. 4.4.6.(2). Mi Pueblo currently has, and seeks to maintain, a general account (the Main Account), its payroll account, payables account, the MoneyGram account, and the

**MOTION FOR ORDER AUTHORIZING CASH-MANAGEMENT AND CREDIT CARD MERCHANT PAYMENT SYSTEMS** Page **10**

account with Union Bank for managing credit card deposits. Mi Pueblo is in control of all of these accounts, controls disbursements and is able to prevent against the unintended payment of any pre-petition obligations. Accordingly, Mi Pueblo believes that its Bank Accounts are in compliance with section 345.

28. Mi Pueblo respectfully submits that closing the existing accounts and opening new ones would result in needless costs in both time and money with no discernible benefit to the estate. For example, closing the payroll account and opening another will provide no benefit and only be an additional burden to Mi Pueblo. No disbursements are made out of the payroll account except for payroll. Similarly, the MoneyGram Account is exclusively for MoneyGram trust funds, which are passed through from the customers to MoneyGram. Adding "debtor-in-possession" to the name of the account would serve no purpose.

29. In addition, Mi Pueblo does not presently maintain an account for tax purposes. Instead, Mi Pueblo monitors and processes funds for payment of taxes through its Cash Management System to assure that taxes are paid appropriately.[2] Requiring Mi Pueblo to open an additional tax account would require Mi Pueblo to revise its Cash Management System and compel it to devote more personnel time to maintaining the new account.

30. As described above, the use of the Bank Accounts and Cash Management System allows Mi Pueblo to monitor and control its revenue from each store and its disbursements. Closing the current accounts and opening new ones would be extremely burdensome, especially at a time when Mi Pueblo's accounting personnel are already

---

[2] Separately Mi Pueblo will file its Motion for Order Authorizing Payment of Sales, Use and Other Taxes Accruing Pre-Petition in the Ordinary Course of Business seeking *inter alia,* authorization to pay outstanding sales, use and similar taxes which accrued pre-petition but were not yet due and owing or were not paid in full as of the Petition Date, to certain taxing authorities in the ordinary course of business.

**MOTION FOR ORDER AUTHORIZING CASH-MANAGEMENT AND CREDIT CARD MERCHANT PAYMENT SYSTEMS** **Page 11**

addressing the numerous matters related to the commencement of the Bankruptcy Case.

**B. Credit Card Merchant Payment System**

31. To facilitate transactions with its customers, Debtor seeks authority (a) to continue the Credit Card Merchant Payment System, including its business practices with the Payment Processors, and (b) to pay the Payment Processors any pre-petition fees attributable to pre-petition card transactions not collected prior to the Petition Date. Mi Pueblo's Processing Agreements with the Payment Processors, and the fees associated therewith, are typical of agreements with other merchants that honor and process customer credit cards and debit cards. Mi Pueblo believes that the Processing Agreements do not constitute "debt financing" or "financial accommodations" as contemplated by section 365(c) of the Bankruptcy Code (which provides for a right to terminate such contracts by the non-debtor party) and that in fact, such agreements are assumable under section 365. *See e.g., In re Thomas B. Hamilton Co.*, 969 F.2d. 1013 (11th Cir. 1992) ("credit card merchant agreements . . . are not contracts to extend financial accommodations within the meaning of §§ 365(c)(2) and 365(e)(2)(B); that is, we conclude that a contract is not one to extend financial accommodations when it involves an agreement for a bank to purchase credit card sales drafts from a merchant with recourse against the merchant for rejected sales); *In re United Airlines, Inc.*, 368 F.3d 720 (7th Cir. 2004) ("we hold that a trustee in bankruptcy, or a debtor in possession, may assume a credit-card-processing agreement"); *see also In re AC Direct, Inc.*, 2010 Bankr. LEXIS 381 (Bankr. M.D. Fla. 2010) (where court issued order to show cause regarding sanctions for cancellation of merchant account contract).

32. While Mi Pueblo is not seeking to assume or reject the Processing Agreements at this time, it urges the Court to allow it to continue with its business practices with the Payment Processors under the Processing Agreements and to maintain its Credit Card Merchant Payment System for its customers. A substantial

**MOTION FOR ORDER AUTHORIZING CASH-MANAGEMENT AND CREDIT CARD MERCHANT PAYMENT SYSTEMS** Page 12

amount of customer purchases are made with credit cards or bank debit cards. Maintaining the business practices with the Payment Processors not only establishes a sustained cash flow mechanism for Mi Pueblo's revenues but is essential to the overall operations of Mi Pueblo's business. Unless Mi Pueblo is allowed to continue with its business practices with the Payment Processors, its ability to collect payment from customers will be severely hindered. Therefore, it is in the estate's best interests that Mi Pueblo maintain the Credit Card Merchant Payment System and pay the Payment Processors any uncollected pre-petition fees attributable to pre-petition card transactions.

### C. Business Forms

33. In Mi Pueblo's business judgment, continuing to use its present Business forms will reduce costs to the estate by eliminating the unnecessary and expensive burden of reproducing the Business Forms, especially since the company already has a stock supply of the forms. Moreover, keeping the current Business Forms will allow Mi Pueblo to protect and preserve goodwill with its customers and vendors. As set forth above, customers and vendors will be aware of Mi Pueblo's bankruptcy as a result of general publicity and by Mi Pueblo's issuing a press release. As such Mi Pueblo submits that it should be allowed to continue to use its current Business Forms without reference to "debtor-in-possession."

### D. The Requested Relief Is In the Ordinary Course.

34. Section 363 of the Bankruptcy Code provides that only transactions outside the ordinary course of business require court approval, while transactions within the ordinary course of business may be entered into by debtors without notice or court approval. 11 U.S.C. § 363(b)(1).

35. Through this Cash Management Motion, Mi Pueblo requests authority to continue to employ its Cash Management System, including retaining the Bank Accounts, providing the service at the Customer Service Counters with MoneyGram and

**MOTION FOR ORDER AUTHORIZING CASH-MANAGEMENT AND CREDIT CARD MERCHANT PAYMENT SYSTEMS** Page 13

Cha Cha, and using its Credit Card Merchant Payment System, including the Processing Agreements. The practices encompassed by these systems are well established. Mi Pueblo has maintained a relationship with its banks and the Payment Processors within the Cash Management System for many years. Moreover, Mi Pueblo believes that practices similar to its Cash Management System and Credit Card Merchant Payment System are standard to within the retail grocery industry, and that the customer services for money orders, transfers, and check cashing are common in the ethnic grocery industry, and that they are essential to operating a multiple-store retail grocery chain. Consequently, the relief requested herein is in the ordinary course of Mi Pueblo's business and is therefore authorized pursuant to Section 363(c).

36. While the Cash Management Motion requests authorization to allow the Payment Processors to collect any pre-petition fees attributable to pre-petition card transactions not collected prior to the Petition Date, Mi Pueblo believes that any such pre-petition amounts are *de minimus* in relation to the value to the estate of continuing the Credit Card Merchant Payment System without interruption. Furthermore, as described above, First Data, and AMEX each may offset any fees owed to them against collected receipts. Accordingly, allowing the business practices to continue with the Payment Processors and allowing Mi Pueblo to continue to allow the Payment Processors to collect any pre-petition fees on pre-petition transactions not yet settled will not prejudice the rights of Mi Pueblo's creditors nor will it be detrimental to the estate.

**F. The Relief Requested Is Within Mi Pueblo's Reasonable Business Judgment.**

37. To the extent any practices within the Cash Management System and the Credit Card Merchant Payment System constitute transactions outside of the "ordinary course of business," they may be approved as within the reasonable business judgment of Mi Pueblo. Sections 1107 and 1108 authorize a debtor in possession to operate its business as a trustee in a chapter 11 case. And courts afford broad deference to the

**MOTION FOR ORDER AUTHORIZING CASH-MANAGEMENT AND CREDIT CARD MERCHANT PAYMENT SYSTEMS** Page 14

reasonable business judgment of debtor in possession. *Bennett v. Williams*, 892 F.2d. 822, 824 (9th Cir. 1989).

38. Here, Mi Pueblo seeks to maintain its established, streamlined Cash Management System and Credit Card Merchant Payment System. These systems will enable Mi Pueblo to operate and monitor its finances, disbursements, receipts and tax obligations accurately, to process transactions efficiently, and to offer its customers the ability to continue purchases with credit cards, debit cards and/or EBT payments. As a result, Mi Pueblo has determined in its business judgment that it is in the best interests of the estate to continue its Cash Management System and Credit Card Merchant Payment System.

**G. Related Relief and Bankruptcy Rules 6003 and 6004**

39. In addition, Mi Pueblo submits that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to Mi Pueblo for the reasons set forth herein, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") has been satisfied.

40. To successfully implement the foregoing, Mi Pueblo seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

41. Without the Cash Management System and the Credit Card Merchant Payment System, disbursements and customer sales will be delayed, and Mi Pueblo will be unable to track receipts and transactions effectively. Late payments may cause suppliers to withhold necessary goods and services.

42. Moreover, as set forth in the Budget, Mi Pueblo will need to pay necessary and reasonable expenses for its continued operations, including, but not limited to, payroll, utility deposits and payments to vendors. Failure to make these payments will result in immediate and irreparable harm to Mi Pueblo. Mi Pueblo must be able to pay its employees and vendors in the ordinary course of business to continue operations

and maintain the going concern value of its business in order to maximize its assets for the benefit of its creditors. By a separate motion, Mi Pueblo will seek an order using cash collateral for these expenses, but seeks relief under this Motion to ensure continuity of operations.

**WHEREFORE**, Mi Pueblo prays that this Court enter its order as follows:

1. Authorizing, but not directing, Mi Pueblo to continue to utilize its pre-petition Cash Management System, including the use of its existing Bank Accounts, in the ordinary course of its business;

2. Requiring Mi Pueblo's banks to continue to honor checks and disbursements from the Bank Accounts;

3. Authorizing Mi Pueblo to continue its business practices with the Payment Processors pursuant to the Processing Agreements and to maintain its pre-petition Credit Card Merchant Payment System;

4. Authorizing Mi Pueblo to pay the Payment Processors any uncollected pre-petition fees attributable to pre-petition card transactions;

5. Authorizing Mi Pueblo to continue to use its existing Business forms without reference to its debtor-in-possession status;

6. Finding that notice is adequate under the circumstances under the case under Bankruptcy Rule 6004(a);

7. Waiving the ten-day stay requirement, to the extent applicable, under Bankruptcy Rule 6004(h); and

8. For such other and further relief as the Court deems just and proper.

///
///
///
///

**MOTION FOR ORDER AUTHORIZING CASH-MANAGEMENT AND CREDIT CARD MERCHANT PAYMENT SYSTEMS** **Page 16**

Dated: July 22, 2013

BINDER & MALTER, LLP

By: /s/ Wendy W. Smith
    Wendy W. Smith

Proposed Attorneys for Debtor and Debtor-in-possession TECHNOLOGY PROPERTIES LIMITED LLC