JEFFER MANGELS BUTLER & MITCHELL LLP
ROBERT B. KAPLAN, P.C.
(Bar No. 76950)
NICOLAS DE LANCIE
(Bar No. 84934)
Two Embarcadero Center, Fifth Floor
San Francisco, California 94111-3813
Telephone: (415) 398-8080
Facsimile: (415) 398-5584

Attorneys for Secured Creditor
WELLS FARGO BANK, N.A.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>MI PUEBLO SAN JOSE, INC.,<br><br>    Debtor and Debtor-in-Possession. | CASE NO. 13-53893-ASW<br><br>Chapter 11<br><br>**OBJECTION TO APPLICATION BY PACIFIC MEAT COMPANY FOR ALLOWANCE AND PAYMENT OF CHAPTER 11 ADMINISTRATIVE CLAIM UNDER BANKRUPTCY CODE § 503(b)(9) AND REQUEST FOR HEARING**<br><br>Date: September 10, 2013<br>Time: 3:00 p.m.<br>Place: Courtroom 3020<br>       280 South First Street<br>       San Jose, California |

**TO: THE HONORABLE ARTHUR S. WEISSBRODT, BANKRUPTCY JUDGE, PACIFIC MEAT COMPANY, ITS ATTORNEYS OF RECORD AND OTHER PARTIES-IN-INTEREST:**

      PLEASE TAKE NOTICE that Wells Fargo Bank, National Association ("Bank") hereby objects (the "Objection") to the Application for Allowance and Payment of Chapter 11 Administrative Expense Under Bankruptcy Code § 503(b)(9) filed by Gaukel Enterprises, Inc. d/b/a Pacific Meat Company on August 7, 2013 (the "Application") [Docket No. 112] and requests that a

PRINTED ON
RECYCLED PAPER
SF 1501462v2

Case: 13-53893    Doc# 211    Filed: 08/30/13    Entered: 08/30/13 17:14:55    Page 1 of 14

- 1 -    OBJCT/APPL BY PACIFIC MEAT COMPANY
FOR ALLOWANCE & PAYMENT [Pacific Meat]

hearing take place on the Bank's Objection on September 10, 2013 at 3:00 p.m. in the above-entitled Court pursuant to the terms of that certain Notice of Hearing on (1) Application by Pacific Meat Company for Allowance and Payment of Chapter 11 Administrative Expense Under Bankruptcy Code § 503(b)(9); (2) Wells Fargo Bank's Opposition Thereto; and (3) Opportunity for Hearing by Other Parties on Said Application which was filed on August 12, 2013 [Docket No. 127].

## INTRODUCTION

Pacific Meat Company seeks allowance and payment of its administrative claim pursuant to 11 U.S.C. § 503(b)(9) ("503(b)(9) Claim"). Pursuant to the Procedures Order (as that term is defined below), Mi Pueblo San Jose, Inc. ("Debtor") delivered a Claim Package to the Bank at 5:20 p.m. on August 28, 2013 requesting the Bank consent to the allowance and payment of the Pacific Meat Company 503(b)(9) Claim which the Bank is required to respond to pursuant to the Procedures Order by 5:20 p.m. on September 3, 2013. The Bank will advise this Court in a supplemental pleading to be filed after the date of this Objection whether the Bank consents to the **allowance** of the Pacific Meat Company 503(b)(9) Claim. However, the Bank will not consent to the **payment** of the Pacific Meat Company 503(b)(9) Claim.

There is no provision in the Bankruptcy Code that requires immediate payment of the Pacific Meat Company 503(b)(9) Claim. The timing of payment of administrative claims asserted under 11 U.S.C. § 503(b)(9) is within the discretion of the Bankruptcy Court, and many courts have denied requests for immediate payment of claims under section 503(b)(9) because to do so destroys the goal of an orderly and equal distribution among creditors once a bankruptcy is filed, and starts a race to the debtor's assets. Other courts consider the prejudice to the debtor, the hardship to the claimant, and the potential detriment to other creditors in determining whether claims asserted under section 503(b)(9) should be paid immediately. Further, where a claimant is seeking payment of a claim under section 503(b)(9) from a secured creditor's cash collateral, many courts have taken the position that such payments cannot be made without the secured creditor's consent, especially where the claimant seeking payment is **not a critical vendor**, necessary for a debtor's reorganization. Finally, other courts look to the expense and length of a bankruptcy case's administration, before ordering that claims asserted under section 503(b)(9) should be paid

immediately.

All of the factors set forth above militate against the immediate **payment** of the Pacific Meat Company 503(b)(9) Claim for a number of reasons.

First, the Application fails to disclose to this Court that the Debtor is in fact doing significant business with Pacific Meat Company and recently paid Pacific Meat Company in excess of $164,000 for the purchase of product. Since Pacific Meat Company still continues to do business with the Debtor, it clearly cannot be considered a critical vendor whose 503(b)(9) Claim must be paid now in order for the Debtor to remain in business.

Second, even though the Debtor's bankruptcy case is over five weeks old and the Debtor has not paid a single claim asserted under section 503(b)(9), the Debtor remains in business.

Third, the Procedures Motion (as that term is defined below) filed by the Debtor stated that potential claims under section 503(b)(9) were in excess of $8,500,000. In addition, the bankruptcy schedules recently filed by the Debtor state that the Debtor has unsecured creditors in excess of $35,000,000. The Application fails to address the issue of why potential administrative claims under section 503(b)(9) should be paid now, in light of the substantial amount of unsecured creditors who will need to wait months or years to be paid.

Fourth, the Application contains no analysis of the financial impact on the Debtor if it was required to make payment of all claims asserted under section 503(b)(9) of approximately $8,500,000. Payment of Pacific Meat Company's 503(b)(9) Claim would cause a "run on the Debtor's assets", and the Debtor simply does not have cash available to pay all of its section 503(b)(9) claims. The weekly financial reporting provided by the Debtor to the Bank indicates that the Debtor's cash receipts are weak, has not achieved its projected cash receipts for the weeks ending August 4, 2013, August 11, 2013, August 18, 2013 and August 25, 2013, and **has sales which are cumulatively under its projection by approximately $4,750,000 for these weeks**. In addition, the financial reporting projects that the Debtor will have an ending cash balance as of October 6, 2013 of only approximately $6,400,000. In light of the foregoing, how can the Debtor make payment immediately to section 503(b)(9) claims which are in excess of $8,500,000? Moreover, the cash collateral budget for the approximate four-week period ending October 6, 2009

submitted by the Debtor to the Bank which has been approved, contains line items for the payment of professional fees of $325,000 **for this short period of time**. Thus, as this Court has noted, the administrative claims of the Debtor arising post-petition which are required to be paid on a regular basis are significant and it is inappropriate for the almost $8,500,000 in pre-petition administrative claims arising under section 503(b)(9) to be paid now.

In light of the foregoing, and the fact that the outstanding obligations owed by the Debtor to the Bank are an amount in excess of $26,000,000 according to the Debtor's bankruptcy schedules, it is inappropriate at this early stage of the Debtor's case to order payment of Pacific Meat Company's 503(b)(9) Claim. This is especially the case as related debtor Cha Cha Enterprises, LLC ("Cha Cha") has taken the position that certain additional collateral obtained by the Bank to secure repayment of the obligations owed by the Debtor to the Bank is "avoidable." Until such time as all of the issues set forth above are sorted out, including the scope of the Bank's liens, there should be no payment to Pacific Meat Company on account of its 503(b)(9) Claim from the Bank's cash collateral.

### STATEMENT OF FACTS

**A.    Procedural History**

As is more specifically set forth in the accompanying Declaration of Robert B. Kaplan in support of the Bank's Objection ("Kaplan Decl."), on July 24, 2013, this Court signed that certain Order (I) Granting Administrative Expense Status to Debtor's Undisputed Obligations to Vendors Arising Form Post-Petition Delivery of Goods Ordered Pre-Petition and Authorizing Debtor to Pay Such Obligations in the Ordinary Course of Business; (II) Authorizing Payment for Goods Received Within 20 Days of Filing and Establishing Administrative Claims Bar Date for Section 503(b)(9) Claims; and (III) Establishing Procedures to Allow Claims of Perishable Agricultural Commodities Act and Packers and Stockyard Act Claimants ("Procedures Order"). The Procedures Order established a procedure for the Debtor to review claims for payment made by the Debtor's vendors pursuant to the Perishable Agricultural Commodities Act, the Packers and Stockyard Act and pursuant to 11 U.S.C. § 503(b)(9). Kaplan Decl., ¶ 2, Exhibit 1. Section 3 of the Procedures Order approved a procedure to identify and resolve section 503(b)(9) claims pursuant to

paragraph 14 of the Motion for Order (I) Granting Administrative Expense Status to Debtor's Undisputed Obligations to Vendors Arising From Post-Petition Delivery of Goods Ordered Pre-Petition etc. which was filed on July 22, 2013 [Docket No. 13] ("Procedures Motion").

Section 6 of the Procedures Order provides as follows:

> 6. **Prior to payment of any claim under Bankruptcy Code section 503(b)(9) PACA or PSA pursuant to this Order**, Mi Pueblo shall deliver to WFB and its counsel, Robert B. Kaplan, Esq. and Nicolas De Lancie, Esq., via electronic mail the invoices, proof of delivery, summary of the foregoing, dates of delivery and any other documents Mi Pueblo deems appropriate (each a "Claim Package"). WFB shall have three business days after the date of its receipt of each Claim Package to review the documentation supplied. If WFB does not object to payment of the claim that is the subject of the Claim Package within the specified time period by delivering its objection to the Claim Package by electronic mail to Mi Pueblo's counsel, Robert G. Harris, Esq. or Wendy Smith, Esq., Mi Pueblo may pay that claim. If WFB does object to payment of the claim, and the parties are unable to resolve the objection through negotiation, then Mi Pueblo shall set a hearing on not less than 20 calendar days' notice on WFB's objection, WFB shall file and serve its objection and any supporting authorities and evidence (the "WFB Brief") on Mi Pueblo and the claimant within 5 calendar days of the date of its objection. Mi Pueblo and the claimant shall file and serve any response to said objection not later than 5 calendar days after service of the WFB Brief. (Emphasis added.)

On August 7, 2013, Pacific Meat Company filed its Application. Kaplan Decl., ¶ 7, Exhibit 7. Thereafter, on August 9, 2013, the Bank filed its Opposition to the Pacific Meat Company Application, Kaplan Decl., ¶ 7, Exhibit 8, in part on the grounds that no payment could be made by the Debtor to Pacific Meat Company **because no Claims Package** relating to the payment of Pacific Meat Company's claim under 11 U.S.C. § 503(b)(9) had been submitted to the Bank pursuant to section 6 of the Procedures Order.

As is set forth in detail in the Kaplan Decl., ¶¶ 4, 5, 6, 8 and 10, prior to the filing of the Pacific Meat Company Application, the Debtor had not submitted a Claim Package to the Bank requesting allowance and payment to the Bank requesting payment of Pacific Meat's 503(b)(9) Claim. However, during the late afternoon of August 28, 2013, the Bank finally received a Claim Package from Mi Pueblo requesting allowance and payment of Pacific Meat Company's 503(b)(9) Claim. The Bank's response thereto is due the late afternoon of September 3, 2013, and the Bank will, next week, file a supplemental pleading in connection with this Opposition stating whether or

not the Bank objects to the allowance of the Pacific Meat Company 503(b)(9) Claim.

On August 12, 2013, Pacific Meat Company filed a Notice of Hearing on (1) Application by Pacific Meat Company for Allowance and Payment of Chapter 11 Administrative Expense Claim under Bankruptcy Code Section 503(b)(9); (2) Wells Fargo Bank's Opposition Thereto; and (3) Opportunity for Hearing by Other Parties on Said Application. Kaplan Decl., ¶ 9, Exhibit 11.

**B.     The Debtor's Financial Condition**

As this Court is well aware, the Debtor's Chapter 11 case has numerous creditors who are owed large amounts of money. The Debtor's Schedule E –Creditors Holding Unsecured Priority Claims [Docket No. 146] states those liabilities are approximately $4,800,000, while the Debtor's Schedule F – Creditors Holding Unsecured Nonpriority Claims [Docket No. 146] states those liabilities are approximately $34,550,000. Moreover, Debtor's Schedule D – Creditors Holding Secured Clams [Docket No. 146] states that the outstanding obligations owed to the Bank and other secured creditors are in excess of $29,000,000.

Prior of the filing of the Debtor's bankruptcy case, the Bank obtained additional collateral from Cha Cha to secure repayment of the outstanding obligations owed by the Debtor to the Bank. In its Memorandum of Points and Authorities in Support of Emergency Motion for an Order Interim Use of Cash Collateral and Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 filed on July 22, 2013 in the Chapter 11 case entitled In re Cha Cha Enterprises, LLC, Case No. 13-53894 ("Cha Cha Emergency Motion") [Docket No. 312], Cha Cha stated in paragraph 10 which appears on pages 4 and 5 that the additional security interests obtained by the Bank prior to this bankruptcy filing "are avoidable."[1]

The Procedures Motion was supported by the Declaration of Juvenal Chavez which stated in paragraph 7 that the total amount of claims which could be asserted against the Debtor pursuant to Bankruptcy Code § 503(b)(9) could be as "high as $8,465,068." Paragraph 7 of Mr. Chavez' Declaration further stated in a conclusory fashion without any evidence that the Debtor

---

[1] Needless to say, the Bank disagrees with this contention.

believed it was "essential that these creditors . . . continue to be paid in the ordinary course of business in order to allow for its business and operations to continue" and further estimated that **there were 168 vendors in this category**.

As is more specifically set forth in the accompanying Declaration of Currie Butzbaugh in support of the Bank's Objection ("Butzbaugh Decl."), although Pacific Meat Company's 503(b)(9) Claim has not been paid, since the date of the Debtor's bankruptcy filing on July 22, 2013, the Debtor has made payments to Pacific Meat Company on account of post-petition date sales of product made by Pacific Meat Company to the Debtor in the amount of $166,000. Butzbaugh Decl., ¶ 4, Exhibit 1. In addition, financial reporting provided by the Debtor to the Bank indicates that the Debtor's sales for the weeks ending August 4, 2013, August 11, 2013, August 18, 2013 and August 25, 2013 are approximately $4,700,000 less than originally projected on a cumulative basis, as summarized in the chart which follows (Butzbaugh Decl., ¶¶ 5 and 6, Exhibits 2 and 3):

| Week Ending | Projected Cash Receipts | Actual Cash Receipts | Cash Shortfall |
|---|---|---|---|
| August 4, 2013 | $8,813,000 | $6,970,694 | $1,842,306 |
| August 11, 2013 | $7,924,000 | $7,517,041 | $406,959 |
| August 18, 2013 | $8,346,000 | $6,857,416 | $1,488,584 |
| August 25, 2013 | $7,577,000 | $6,556,011 | $1,020,989 |
| | | **Total Cash Shortfall:** | **$4,758,838** |

Moreover, the Cash Forecast provided by the Debtor to the Bank on April 28, 2013 indicates that the Debtor's cash **will decrease** by $4,106,633 between the week ending September 1, 2013 and October 6, 2013, i.e., $10,577,417–$6,470,784. Butzbaugh Decl., ¶ 7, Exhibit 4. In addition, and equally significantly, the Cash Forecast states that the Debtor **will only have cash on hand for the week ending October 6, 2013 of $6,470,784**. Butzbaugh Decl., ¶ 7, Exhibit 4.

**1.**

**THE LAW GOVERNING THE PAYMENT OF CLAIMS ASSERTED UNDER 11 U.S.C. § 503(b)(9)**

One of the new provisions added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 was 11 U.S.C. § 503(b)(9), which states as

follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title including – . . .
>
> (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

The court in In re Bookbinders' Restaurant, Inc. 2006 WL 3858020 (Bankr. E.D. Pa. 2006) stated as follows with respect to the enactment of section 503(b)(9):

> Section 503(b)(9) effectively converted what previously was a prepetition 'claim' into an allowable administrative expense (footnote omitted). This new status provides at least two benefits to holder of an administrative expense allowed under § 503(b)(9). First, the allowed expense must be paid in full as a condition of confirmation of a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A) . . . . Previously, the same liability was treated as a prepetition claim that could be classified in a plan of reorganization, was subject to plan voting and was susceptible to being paid only partially in a plan confirmed over the creditor's dissent . . . . The second possible benefit to the creditor is that there is a potential for a more prompt payment of "the 20 day" liability. Since the liability is an administrative expense and not a prepetition claim, a chapter 11 debtor **with adequate resources** can pay the allowed administrative expense prior to confirmation. (Emphasis added.) 26 WL3858020 at *3.

Neither Bankruptcy Code section 503(a) nor Bankruptcy Code section 503(b) provides explicit guidance to the Bankruptcy Court as to when an allowed administrative expense claim should be paid. In Bookbinders, the court stated as follows with respect to when an administrative expense claim must be paid in a Chapter 11 case:

> The considerations which guide a court's decision whether to order immediate payment of an allowed administrative expense have been described in different ways. In *Dieckhaus Stationers*, the court stated its discretion should be exercised "with reference to other provisions and policies of the Code". 73 B.R. at 972. Other courts have been more specific. In *HQ Global Holdings*, the court stated that the court should consider "bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets." 282 B.R. at 173 . . . . [I]n *In re Garden Ridge Corporation*, the court stated it would consider 'prejudice to the debtor, hardship to the claimant, and the potential detriment to other creditors.' 323 B.R. at 143. 2006 WL3858020 at *4.

In Bookbinders, the court rejected the contention made by a claimant that it was entitled to immediate payment of its allowed expense claim under section 503(b)(9):

> There is nothing in the language of § 503(b)(9) to support [the creditor's] suggestion that it is entitled to immediate payment of its allowed expense **in derogation of the accepted principle that the timing of payment of an allowed administrative expense is within the court's discretion**. Section 503(b)(9) does nothing more than define a type of liability, previously treated as a prepetition claim, which is now accorded administrative expense status. **The text of § 503(b)(9) neither states nor even implies that allowance of the expense encompasses an unqualified right to immediate payment**. Nor does the text of the provision suggest that an administrative expense allowed under § 503(b)(9) is to be treated in a more favorable manner than other allowed § 503(b) administrative expense. (Emphasis added.) 2006 WL 3858020, at *4.

Finally, the court in Bookbinders rejected the claimant's contention that since post-petition creditors were being paid in the ordinary course of business for goods and services provided, a section 503(b)(9) administrative expense claimant must also be paid in the same manner. The Court noted that post-petition payments to trade creditors were being paid pursuant to the provisions of Bankruptcy Code § 363(c)(1), which allows a debtor in possession to enter into transactions, including the sale or lease of property of the estate, "in the ordinary course of business," without notice or a hearing, and [to] use property of the estate in the ordinary course of business without notice or a hearing."

In deciding whether immediate payment of section 503(b)(9) claims is appropriate, bankruptcy courts must consider (i) the prejudice to the debtor, (ii) the hardship to section 503(b)(9) claimants, if any, and (iii) the detriment to other creditors. See e.g., In re Garden Ridge Corp., 323 B.R. 136, 143 (Bankr. D. Del. 2005). Additionally, in making a determination as to when administrative claimants must be paid, one of the chief factors the courts consider is bankruptcy goals of an orderly and equal distribution among creditors and need to prevent a race to the debtor's assets. In re Baptist Medical Center of New York, Inc., 52 B.R. 417, 421 (E.D.N.Y. 1985). Other factors the Court must look to are whether the estate may be able to pay all **administrative expenses** in full, In re Standard Furniture, 3 B.R. 527, 532 (Bankr. S.D. Cal. 1980), and the length and expense of a bankruptcy case's administration. In re Reams Broadcasting Corp., 153 B.R. 520, 522 (Bankr. N.D. Ohio 1993); In re Barron, 73 B.R. 812, 814 (Bankr. S.D. Cal. 1987).

Additionally, in <u>In re Arts Dairy, LLC</u>, 414 B.R. 219 (Bankr. M.D. Ohio 2009), the Court refused to order payment of a section 503(b)(9) claim over secured creditor's objection and initially stated as follows:

> When considering the propriety of authorizing an immediate payment to an administrative claimant, courts generally weigh three factors: (a) prejudice to the debtor; (b) hardship to the claimant; and (c) potential detriment to other creditors. (citations omitted) <u>Id.</u> at 221.

Furthermore, the <u>Arts</u> Court explained that where the administrative claimant is seeking payment from **a secured creditor's** collateral, additional considerations apply:

> **Bankruptcy law has codified the long-standing and well-established priority scheme whereby secured debts are generally entitled to be paid ahead of unsecured debts, and unsecured debts are entitled to a distribution of a debtor's assets ahead of the holders of equity interests**. (citation omitted) Based upon the Bankruptcy Code's priority scheme, the Supreme Court of the United States elucidated that, unless otherwise authorized by the Code, administrative expenses in bankruptcy, being unsecured debts, do not take priority over secured claims. <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 530 U.S. 1, 5 . . . In this matter, AgStar Financial Services claims first priority mortgage liens and security interests in substantially all of the Debtor's assets – including cash proceeds, otherwise known as cash collateral. No party has been able to identify to the Court a source of funds, outside AgStar's interest in cash collateral, which would be presently available to pay the Claimants their administrative claim. The use of AgStar's cash collateral will, therefore, be necessary to pay the Claimants their administrative claim.
>
> Pursuant to § 363(c)(2), however cash collateral may only be used to pay obligations of the debtor if either (1) the entities with an interest in the collateral consent to its use, or (2) the court authorizes its use. In this matter, the first prerequisite to the use of cash collateral is not applicable, with AgStar strongly objecting to the payment of the Claimants' administrative expense . . . <u>Id.</u>. at 222. (Emphasis added.)

Finally, the <u>Arts</u> Court further held there was no compelling reason why the section 503(b)(9) claimant needed to be paid immediately, especially since the claimant had not established it was a "critical vendor":

> First, there is no compelling reason showing that the Claimants . . . should be afforded favorable treatment over other similarly situated creditors. The Debtor, for example, did not identify the Claimants as a critical vendor, necessary for its reorganization (footnote omitted).

Second, nothing in this Court's prior order authorizing the use of cash collateral contemplates that administrative expenses would be immediately paid. . .

For these reasons, the Claimants . . . have failed to establish that they are entitled to the immediate payment of their administrative claim. Consequently, while they will be allowed an administrative claim for $3,895.10, the Claimants will only become entitled to receive payment on their claim when all other similarly situated claims also become entitled to receive payment. Id. at 222-223.

Finally, as noted above in the Arts decision, this Court needs to keep in mind the decision of the Supreme Court in Hartford Underwriters Insurance Company v. Union Planters Bank, N.A. (2000) 530 U.S. 1. In Hartford, the United States Supreme Court held that the Bankruptcy Code does not provide an administrative claimant an independent right to seek payment of its claim from property encumbered by a secured creditor's lien under section 506(c). Under 11 U.S.C. § 506(c) in this regard, it stated as follows:

On the other side of the ledger, petitioner's reading would lead itself to results that seem undesirable as a matter of policy. In particular, expanding the number of parties who can use § 506(c) would create the possibility of multiple administrative claims seeking recovery under the section. Each such claim would require inquiry into the necessity of the services at issue and the degree of benefit to the secured creditor. Allowing recovery to be sought at the behest of parties other than the trustee could therefore impair the ability of the bankruptcy court to coordinate proceedings, as well as the ability of the trustee to manage the estate . . . Further, where unencumbered assets were scarce, creditors might attempt to use § 506(c) even though their claim to have benefited the secured creditor was quite weak. The possibility of being targeted for such claims by various administrative claimants could make secured creditors less willing to provide postpetition financing. Id. at 12-13.

**2.**

**THE APPLICATION SHOULD BE DENIED INSOFAR AS IT REQUESTS IMMEDIATE PAYMENT OF PACIFIC MEAT COMPANY'S 503(b)(9) CLAIM**

The Court should **not** grant the Application, insofar as it seeks **payment** of Pacific Meat Company's 503(b)(9), Claim for a myriad of reasons. First, as was noted in the Arts and Bookbinder decisions cited above, there is no requirement in the Bankruptcy Code that claims asserted under section 503(b)(9) be paid immediately.

///

Second, for this Court to order payment of Pacific Meat Company's 503(b)(9) Claim, as well as potentially other 167 claims in this category which total approximately $8,500,000, would be contrary to the longstanding and well established priority scheme under the Bankruptcy Code whereby claims of secured creditors are entitled to be first in a Chapter 11 case, before unsecured creditors are paid in full, as was recognized by the Court in the <u>Arts</u> decision.

Third, there is no compelling reason why the 503(b)(9) Claim of Pacific Meat Company should be paid now, as there is no evidence that has been submitted by either the Debtor or Pacific Meat Company that it is a "critical vendor" to the Debtor. Moreover, it is undisputed that Pacific Meat Company continues to do substantial business with the Debtor, in that the Debtor recently purchased and paid for approximately $164,000 of product sold to it by Pacific Meat Company. **In addition, the Debtor's bankruptcy case is over five weeks old and the Debtor has managed to continue to operate in Chapter 11 notwithstanding the fact that it has not made a single payment to any creditor asserting claims under section 503(b)(9)**. Therefore, any argument which Pacific Meat Company may make that the payment of all section 503(b)(9) claims is essential to the viability of the Debtor post-petition rings hollow.

Fourth, the United States Supreme Court in the <u>Hartford</u> decision recognized that unsecured administrative claims cannot be paid from a secured creditor's collateral.

Fifth, the Debtor has not achieved its projected revenues for the last several weeks, after it filed its Chapter 11 case. In light of the foregoing, it would be inappropriate for this Court to order immediate payment of Pacific Meat Company's 503(b)(9) Claim, since for the Court to do so, would also "open the flood gates" for the payment of approximately $8,500,000 of 167 other such alleged claims which apparently exist. The Application contains no analysis of how the Debtor's financial condition, with its sales having been approximately $4,700,000 less on a cumulative basis than was projected to date, will be impacted by a requirement that it immediately pay over $8,500,000 in claims. The Debtor's own forecast indicates it will have burned through cash of approximately $4,100,000 between September 1 and October 6, 2013.

Sixth, the Debtor has projected that it will have an ending cash balance on October 6, 2013 of only $6,470,784. This is approximately $2,104,000 less than the amount of

1 section 503(b)(9) claims which the Debtor estimated existed in the Procedures Motion. Clearly, if
2 the Court granted the Application and also allowed other section 503(b)(9) claims to be paid, the
3 Debtor would not have sufficient cash to make payment on all of these claims and the Debtor's
4 bankruptcy case could collapse due to administratively insolvency.

5    Seventh, ordering payment of the 503(b)(9) Claim asserted by Pacific Meat
6 Company would be inappropriate at the time in light of the fact that the Debtor owes to the Bank an
7 amount in excess of $26,000,000, which may be the subject of an avoidance action. In this early
8 stage of the Debtor's bankruptcy case, having unsecured pre-petition administrative creditors paid in
9 full, before the Bank's claims against the Debtor are satisfied, is clearly inappropriate and contrary
10 to the principles underlying the Bankruptcy Code.

11    Finally, among the factors the Court must consider to determine whether claims
12 asserted under section 503(b)(9) must be paid immediately are whether the estate may be able to
13 pay all of its administrative expenses in full and the length and expense of a bankruptcy case's
14 administration. By the time the hearing is held on the Application, the Debtor's bankruptcy case
15 will be less than 60 days old. This Court itself has noted that the Debtor's bankruptcy case will be a
16 very expensive case in terms of expenses of administration, and the Debtor, pursuant to the recent
17 cash collateral budget approved of by the Bank at the interim cash collateral hearing held on
18 August 28, 2013, has budgeted professional fee payments to its counsel, financial advisor, and
19 counsel for the Committee of Unsecured Creditors **of $320,000 for the approximate one month**
20 fiscal period ending October 6, 2013. In light of these administrative expenses which the Debtor
21 needs to pay for a single month, it is also inappropriate for this Court to grant Pacific Meat
22 Company's Application for payment of its 503(b)(9) Claim now.

23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

## CONCLUSION

For the foregoing reasons, the Application should be denied.

DATED: August 30, 2013

JEFFER MANGELS BUTLER & MITCHELL LLP
ROBERT B. KAPLAN, P.C.
NICOLAS DE LANCIE


By: */s/ Robert B. Kaplan*
 ROBERT B. KAPLAN, ESQ.
Attorneys for Secured Creditor WELLS FARGO BANK, N.A.